**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 23-cv-02554-DDD-MDB

MARISA WADE;

Plaintiff,

v.

The DOUGLAS COUNTY SHERIFF'S OFFICE, a governmental entity;
The BOARD OF COUNTY COMMISSIONERS OF DOUGLAS COUNTY,
a governmental entity;
DARREN M. WEEKLY, in his official capacity as Douglas County Sheriff;
WELLPATH LLC;
JEFFREY TOBACK, in his individual capacity; and
EMILY STALLARD, LPNBARRON, RN, in her individual capacity;

Defendants.

_____

**FIRST AMENDED COMPLAINT AND JURY DEMAND**
_____

Plaintiff, by and through her attorneys Matthew Cron and Ciara Anderson of RATHOD
MOHAMEDBHAI LLC, alleges as follows:

**I.       INTRODUCTION**

1.       This is an action brought by Marisa Wade, a 29-year-old woman, to vindicate
serious deprivations of her constitutional and state law rights.

2.       Ms. Wade is a former detainee at the Douglas County Justice Center ("DCJC") who
suffered a stroke while she was incarcerated.

3.       Ms. Wade informed DCJC staff of her stroke symptoms, including shortness of
breath, numbness, and lack of feeling in her left side.

4. Other inmates also repeatedly reported to DCJC staff that Ms. Wade was suffering a stroke, as her stroke signs and symptoms were so obvious that multiple lay people were able to recognize them.

5. Still, medical staff deliberately failed to properly assess and treat Ms. Wade and refused to send her to the hospital for hours.

6. By the time Ms. Wade was brought to the hospital, she had suffered serious injury from the stroke and will need continuing treatment and care.

7. Due to the extreme delay in emergent medical treatment, Ms. Wade is likely to suffer permanent impairments.

8. Ms. Wade also suffers serious emotional harm from these deliberately indifferent and negligent acts.

## II.     JURISDICTION AND VENUE

9. This action arises under the Constitution and laws of the United States and is brought pursuant to 42 U.S.C. § 1983. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331. Jurisdiction supporting Plaintiffs' claim for attorneys' fees and costs is conferred by 42 U.S.C. § 1988.

10. Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b). All of the events and omissions alleged herein occurred within the state of Colorado.

11. Supplemental pendent jurisdiction is based on 28 U.S.C. § 1367 because the violations of federal law alleged are substantial and the pendent causes of action derive from a common nucleus of operative facts.

12.     Pursuant to the Colorado Governmental Immunity Act ("CGIA"), sovereign immunity is waived for Plaintiff's state law claims against the governmental defendants. *See* Colo. Rev. Stat. § 24-10-106(1)(b) and (e).

13.     On August 18, 2023, Plaintiff filed a timely written notice of claim as required by the CGIA. *See* Colo. Rev. Stat. § 24-10-109.

14.     The CGIA does not apply to Plaintiff's claim brought pursuant to C.R.S. § 13-21-131.  *See* C.R.S. § 13-21-131(2)(a) ("The [CGIA] . . . does not apply to claims brought pursuant to this section.").

15.     Wellpath LLC is a private company and therefore no notice of the claims against them was required under the CGIA.

### III.     CERTIFICATE OF REVIEW

16.     Pursuant to C.R.S. § 13-20-602(3)(a), undersigned counsel certifies as follows:

a.     Counsel has consulted with a medical professional with expertise in the areas of the alleged negligent conduct as set forth in Plaintiffs' Complaint and Jury Demand;

b.     The medical professional who has been consulted has reviewed all known facts relevant to the allegations of negligent conduct as complained of in Plaintiffs' Complaint and Jury Demand;

c.     Based upon review of such facts, the medical professional has concluded that the filing of the claims against the Defendants has substantial justification within the meaning of C.R.S. § 13-17-102(4); and

d.      The medical professional who has reviewed all known facts relevant to the allegations of negligent conduct as contained in Plaintiffs' Complaint and Jury Demand meets the requirements set forth in C.R.S. § 13-64-401.

## IV.     PARTIES

### *Plaintiff*

17.     Marisa Wade is a citizen of the United States of America and a resident and domiciliary of the State of Colorado.

### *Defendants*

18.     Defendant Douglas County Sheriff's Office ("DCSO") is the public entity responsible for operating the DCJC. The DCSO is a proper entity to be sued under 42 U.S.C. § 1983.

19.     Defendant Douglas County, by and through its Board of County Commissioners, is also the public entity responsible for Douglas County and DCSO. The Board of County Commissioners of Douglas County is a proper entity to be sued under 42 U.S.C. § 1983.

20.     Defendant Douglas County Sheriff Darren Weekly, in his official capacity, is the public figure responsible for the Douglas County Sheriff's Office and the DCJC. Defendant Weekly is a proper party to be sued under 42 U.S.C. § 1983. The DCSO, Board of County Commissioners, and Sheriff Weekly are referred to collectively as the "Douglas County Defendants."

21.     The Douglas County Defendants are responsible for the oversight, supervision, and training of staff at the DCJC, including employees of Wellpath LLC. The Douglas County Defendants are properly sued under 42 U.S.C. § 1983 with respect to the hereinafter challenged

deliberately indifferent policies and practices for the care and treatment of persons detained at the DCJC, as well as for the policies and practices of Wellpath LLC acting as the contractual final delegated decision makers.

22.     At all relevant times, the Douglas County Defendants had a nondelegable duty to provide adequate medical care to inmates and detainees at DCJC. The Douglas County Defendants are liable under the nondelegable duty doctrine for the deliberate indifference of Defendant Wellpath LLC and its employees or contractors.

23.     Defendant Wellpath LLC ("Wellpath") is a Delaware limited liability company with its principal address located 3340 Perimeter Hill Drive, Nashville, TN 37211. At the time of the events and omissions giving rise to this lawsuit, this company contracted with the Douglas County Defendants to provide medical services to inmates and detainees at the DCJC, and supervised and implemented such services. Further, Defendant Wellpath employed Defendant ~~Stallard~~Barron.

24.     Wellpath has previously been known by several other names, including Correct Care Solutions ("CCS"), Correctional Healthcare Companies ("CHC"), and Correctional Healthcare Management ("CHM"). The corporate organization, leadership, and governance of Wellpath is substantially similar to that of its predecessor companies, and for all intents and purposes, it is the same company. The customs, policies, and practices of CCS, CHC, and CHM are attributable to Wellpath as their successor in interest.

25.     At all times relevant to the subject matter of this litigation, Wellpath contracted with the Douglas County Defendants to provide staff and medical services at DCJC. At all relevant times, Wellpath was responsible for the oversight, supervision, and training of all of the medical

staff at DCJC, including Nurse Emily ~~Stallard~~Barron, and the medical care of inmates housed at DCJC.

26.     At all relevant times, Wellpath was acting under color of state law and performing a central function of the state.

27.     Defendant Wellpath is a private company, and neither it nor any of its employees or contractors are entitled to any immunity under the CGIA on Colorado state law claims or qualified or any other immunity on the federal law claims.

28.     At all times relevant to the subject matter of this lawsuit, Defendant Jeffrey Toback, was a citizen of the United States and a resident of Colorado.  At all relevant times, Defendant Toback was an employee of the Douglas County Sheriff's Office who was POST-Certified and acted under color of state law.

29.     At all times relevant to the subject matter of this lawsuit, Defendant Emily ~~Stallard, LPN~~Barron, RN, was a citizen of the United States and a resident of Colorado. She was an employee of Wellpath and acted under color of state law.

30.     Defendants Toback and ~~Stallard~~Barron are referred to collectively as the "Individual Defendants."

## V.     FACTUAL ALLEGATIONS

31.     At the time that she suffered a stroke at the DCJC, Ms. Wade was a 29-year-old woman with no serious medical conditions.

32.     In May 2023, Ms. Wade began serving a sentence at DCJC.

33.     Ms. Wade shared Cell No. 11 at DCJC with Lamesha Tibbetts.

34.     Cell No. 11 only had one bed, which Ms. Tibbetts slept in.

35.     Because there was only one bed in the cell, Ms. Wade was forced to sleep in a "boat," which is a plastic frame with a mattress on top.



36.     The head of Ms. Wade's mattress was under a metal desk without a stool so she could slide the boat in.

**Ms. Wade Begins Experiencing Symptoms of Stroke**

37.     In late May, Ms. Wade banged her head against the bottom of the metal desk.

38.     She commented to Ms. Tibbetts that it hurt.

39.     Ms. Wade received Tylenol from the medical staff for her headache.

40.     A few days later, on or about the morning of May 29, 2023, Ms. Wade was not feeling well, and Ms. Tibbetts observed that Ms. Wade's demeanor was off and that she was not herself.

41.     Ms. Wade told Ms. Tibbetts that her left arm felt numb and that she felt weird.

42.     Ms. Wade demonstrated the numbness by squeezing her left arm and telling Ms. Tibbets that she felt nothing.

43.     To test the feeling (or lack thereof) in her left side, Ms. Wade ran her right hand under cold water and experienced feeling, but when she did it with her left hand, she again felt nothing.

44.     Ms. Tibbetts could see that the left side of Ms. Wade's face was droopy, like she had received Novocain at a dental visit.

45.     Left-side weakness and facial droopiness are textbook signs that a person may be experiencing a stroke.

46.     That morning, another inmate at DCJC, Krystle Jones, also observed Ms. Wade's symptoms and believed that she was having a stroke.  Ms. Jones was familiar with these symptoms because a friend had previously had a stroke in her presence.

47.     Ms. Wade told Ms. Jones and other inmates that the left part of her body was going numb and that she felt dizzy and sick.

48.     At this time, Ms. Wade's lips were visibly blue, like she was not getting enough oxygen. The color had drained out of her face, and she looked extremely pale.

49.     Ms. Wade was also having trouble standing on her own. In order to stand, she had to brace herself by leaning against objects in the room.

50.     The inmates told Ms. Wade to sit down because it looked like she was going to pass out.

51.     Ms. Jones told the other inmates that she believed that Ms. Wade was having a stroke.

52.     Ms. Jones pressed the emergency button in order to talk to a deputy.

53.     Deputy Toback was on duty and was conversing with another employee.

54.     Deputy Toback did not respond to Ms. Jones' call for help.

55.     Ms. Wade remained slumped over the table and was unable to meaningfully talk or communicate with the other inmates. Ms. Wade's lips remained blue.

56.     At some point, around lunchtime, the guards opened the main door and Ms. Jones was able to speak to Deputy Toback. Ms. Jones told Deputy Toback that Ms. Wade "was dying over here." Ms. Jones also told Deputy Toback that she thought Ms. Wade was having a stroke and she needed help.

57.     However, Deputy Toback did not immediately react to Ms. Jones but continued to pass out lunch trays.

58.     After the lunch trays were passed out, Deputy Toback took Ms. Wade down to the medical unit.

**Wellpath Nurse ~~Stallard~~Barron Ignores Obvious Symptoms of a Stroke**

59.     While at the medical unit, Ms. Wade described her symptoms to Wellpath Nurse Emily ~~Stallard~~Barron.

60.     Ms. Wade informed Nurse ~~Stallard~~Barron that she felt very sick. She stated that her left side was numb, from her shoulder down to her hip. She also relayed that her left eye was droopy, that she was dizzy, that she had a headache, that she lacked balance, and that she was having difficulty communicating.

61.     Based on these symptoms alone, any reasonable person, let alone a reasonable medical professional, would immediately suspect that the patient might be experiencing a stroke.

62.     The F.A.S.T. test is a commonly used method to identify strokes.

63.     Any licensed medical professional, including Nurse ~~Stallard~~Barron, would be trained on the F.A.S.T. test (or an equivalent method).

64.     Any licensed medical professional, including Nurse ~~Stallard~~Barron, would be trained and know how to identify stroke or warning signs thereof.

65.     The "F" in the F.A.S.T. acronym stands for "Face Drooping," and asks whether one side of the face droops or is numb.

66.     As pled above, Ms. Wade informed Nurse ~~Stallard~~Barron that her left eye was droopy.

67.     Additionally, other detainees had observed Ms. Wade's droopy face.  Given that Ms. Wade's droopy face was observable to lay people, it would have also been observable to Nurse ~~Stallard~~Barron.

68.     The "A" in the F.A.S.T. acronym stands for "Arm Weakness," and inquires if one arm is weak or numb.

69.     As pled above, Ms. Wade had informed Nurse ~~Stallard~~Barron that her left side was numb from her shoulder down to her hip.

70.     Despite being informed that Ms. Wade complained of left side numbness, Nurse ~~Stallard~~Barron did not conduct any physical examination to determine the extent of this numbness.

71.     The "S" in the F.A.S.T. acronym stands for "Speech Difficulty," and asks if speech is slurred.

72.     As pled above, Ms. Wade had relayed that she was having difficulty communicating.

73.     Ms. Wade's difficulties communicating were apparent to other detainees and would have been apparent to any reasonable medical professional.

74.     While Face Drooping, Arm Weakness, and Speech Difficulty are key indicators of stroke, other indications of stroke include numbness, particularly on one side of the body, difficulty walking, dizziness, loss of balance or coordination, and headache. Ms. Wade communicated all of these symptoms to Nurse ~~Stallard~~Barron, many of which were readily observable to lay witnesses.

75.     At this visit, Nurse ~~Stallard~~Barron recorded that Ms. Wade's blood pressure was 102/58, indicating hypotension.[1]

76.     Ms. Wade's pulse at the May 29, 2023 visit was 58.

77.     Both Ms. Wade's pulse and blood pressure readings were drastically different than the baseline readings that she had consistently received in the six weeks prior.

78.     Ms. Wade's baseline blood pressure readings from within the month prior were 134/85, 136/88, and 133/91.

79.     Ms. Wade's pulse readings from three separate examinations within the six weeks prior were consistently in the 80s.

80.     The 30 points change in both systolic and diastolic readings is indicative of a substantial change in neurovascular status.

81.     The 30-point change in Ms. Wade's baseline pulse is also indicated a substantial change in a neurovascular status.

---

[1] The pertinent medical records state that these vital signs were taken at 1:06pm. However, video evidence shows that Ms. Wade was in the shower on her cell block at 1:06pm – and had been in the general population for at least the thirty minutes prior. It can only be presumed that Ms. Wade's vital signs were documented well after they were taken.

82.     Ms. Wade, who has a medical background herself, was particularly alarmed at her pulse reading. She informed Nurse ~~Stallard~~Barron that her pulse was significantly lower than normal.

83.     Any reasonable medical professional would know from Ms. Wade's medical chart that her May 29, 2023 vital signs were highly abnormal compared to her baseline readings, and that such substantial drops were further cause for alarm.

84.     The substantial change in Ms. Wade's May 29, 2023 vital signs provided an objective measurement that substantiated Ms. Wade's subjective complaints. Such abnormal vital signs also provided an objective measurement that Ms. Wade was in medical distress.

85.     In combination, Ms. Wade's subjective complaints, visible physical signals (such as droopy eye, left side weakness and numbness, and difficulty standing), and the 30-point change in her vital signs indicated stroke or some other neurovascular crisis that demanded an emergency response.

**Nurse ~~Stallard~~Barron is Deliberately Indifferent to Ms. Wade's Medical Emergency**

86.     Given Ms. Wade's reported symptoms, her manifestations of these symptoms in an observable way that was readily apparent to lay witnesses, and her plunging vital signs, Nurse ~~Stallard~~Barron knew or should have known that there was a significant possibility that Ms. Wade was experiencing stroke or some other medical emergency.

87.     "T," the final letter in the F.A.S.T. acronym is "Time."

88.     Unlike the first three letters in the acronym, Time does not relate to a symptom.

89.     Rather, Time urges that "Stroke is an emergency. Every minute counts. Call 911 immediately." *See Stroke Symptoms,* AM. STROKE ASS'N, https://www.stroke.org/en/about-stroke/stroke-symptoms (last visited Sept. 19, 2023).

90.     Thus, every medical professional knows that when a person displays symptoms of a stroke—as Ms. Wade did here—it is a medical emergency that requires an emergency response.

91.     At this point, the only reasonable medical intervention would have been to send Ms. Wade to the Emergency Room.

92.     Time is particularly important for stroke because there are effective medical treatments that can substantially reduce the impact of stroke.  However, the effectiveness of such treatments are greatly reduced the longer that a stroke goes untreated.

93.     Even if Ms. Wade had not been experiencing stroke, her symptoms were such that stroke was a strong possibility and could only be ruled out in a hospital-like setting.

94.     The DCJC medical unit is not a hospital-like setting.

95.     Nurse ~~Stallard~~Barron, however, did not act in an emergency manner.~~–~~ To the contrary, listening to Ms. Wade's description of her symptoms and taking Ms. Wade's vital signs, Nurse ~~Stallard~~Barron simply remarked that Ms. Wade was fine.

96.     Ms. Wade pleaded with Nurse ~~Stallard~~Barron to perform a more thorough examination due to her severe symptoms and her abnormal vital signs.

97.     Nurse ~~Stallard~~Barron agreed to give Ms. Wade an electrocardiogram ("EKG") examination.

98.     An EKG records the electrical signals from the heart to check for different heart conditions.

99.     An EKG might show the presence or absence of an irregular heart rhythm and heart profusion, which might reveal a cause of stroke.  An EKG would not typically reveal that a person was or was not having a stroke.

100.    Nurse ~~Stallard's~~Barron's recommendation to give Ms. Wade an EKG examination demonstrates that she suspected the possibility of a serious medical condition.

101.    Nurse ~~Stallard~~Barron placed sticky tabs on Ms. Wade's chest as part of the EKG examination. After turning on the machine, she again pronounced that Ms. Wade was fine.

102.    Nurse ~~Stallard~~Barron did not actually conduct an EKG examination.

103.    Indeed, Ms. Wade's medical records that were produced pursuant to an open records request contain no reference to an EKG, let alone a readout of such examination.

104.    Any EKG readout would be preserved in a patient's medical record.

105.    It is important to preserve EKG readouts because such information would be provided to paramedics or other emergency responders.  A previously conducted EKG provides important past data for future providers to compare to current data.

106.    Despite not taking an EKG examination, Nurse ~~Stallard~~Barron informed DCJC staff that she had conducted an EKG examination and that the results were fine.

107.    Nurse ~~Stallard's~~Barron's conveyance to DCJC staff that she conducted an EKG examination also demonstrated her awareness that additional testing beyond vital signs would be expected because of the seriousness of Ms. Wade's symptoms.

108.    By informing DCJC staff that Ms. Wade had received an EKG when she had not (and thus implying that all was well), Nurse ~~Stallard~~Barron intended to ease DCJC staff concerns about Ms. Wade's medical condition.

109.    Nurse ~~Stallard's~~Barron's false conveyance that Ms. Wade received an EKG and that everything was fine lulled DCSO employees into the false belief that Ms. Wade had been fully cleared and was only experiencing a non-serious temporary illness.

110.    When Ms. Wade returned to her cell block, she sat in the common area in front of her meal tray.

111.    Ms. Wade told her roommate, Ms. Tibbets, and two other inmates that she still felt extremely sick.

112.    On video, Ms. Wade is seen in obvious distress.

113.    At the common room table, she periodically rested her head in the cradle of her right arm, and shook her left arm while looking at it.

114.    The three other inmates in the common area appeared to be looking at Ms. Wade with concern.

115.    Around 12:40 pm, Ms. Wade vomited on the lunch table. She was barely able to lift her head from the pool of vomit.

116.    The cell pod was put on lockdown after Ms. Wade vomited and Ms. Wade was left alone in the common area.

117.    A few minutes later, Deputy Toback arrived and spoke to Ms. Wade.

118.    Ms. Wade told Deputy Toback the following:

    a.    "I still have shortness of breath."
    b.    "My arm is numb, into my butt, and I can't feel anything on my left side."
    c.    "I just got hot and kinda sweaty and light headed before I got sick."

119.    Deputy Toback called for medical attention. It was his understanding based on the report from Nurse ~~Stallard~~Barron that Ms. Wade's vital signs and her EKG were unremarkable.

120.     However, Ms. Wade's symptoms and her visible condition were alarming in of themselves that any lay person would have recognized the need for an emergency response.

121.     Around 12:50 pm, Nurse ~~Stallard~~Barron arrived at the cell block and gave Ms. Wade an anti-nausea pill.

122.     Nurse ~~Stallard~~Barron did not conduct any medical examination of Ms. Wade or take her vital signs during this brief visit.

123.     Nurse ~~Stallard~~Barron did not provide Ms. Wade with any medical care or treatment other than providing her with the anti-nausea pill.

124.     The entire interaction between Ms. Wade and Nurse ~~Stallard~~Barron lasted approximately 10 seconds.

125.     During the brief period that Nurse ~~Stallard~~Barron was in the cell block, Ms. Tibbets and another inmate clamored to get Nurse ~~Stallard's~~Barron's attention to discuss Ms. Wade's health.

126.     However, Nurse ~~Stallard~~Barron ignored the detainees.

127.     Nurse ~~Stallard~~Barron told Deputy Toback to monitor the situation.

128.     In total, Nurse ~~Stallard~~Barron was in the cell block for approximately twenty seconds.

129.     Deputy Toback then left the room.  Ms. Wade remained slumped over the table, poking at her left arm to see if it had regained feeling.

130.     Ms. Wade continued to appear in distress, resting her head against her arms, and struggling to sit upright.

131.    Deputy Toback returned a few minutes later and gave Ms. Wade a fresh set of clothes. Deputy Toback told Ms. Wade to take a shower to clean herself up, sip on water, and have her cellmate contact the deputy station if her symptoms worsened.

132.    Deputy Toback then left the room, again leaving Ms. Wade alone.

133.    On video, Ms. Wade had substantially difficult moving toward the shower.

134.     Video depicts Ms. Wade lurching from table to table to support herself.  It appears that Ms. Wade's imbalance was such that she could not take more than a step or two without needing to brace herself on a structure for support.

135.    Prior to May 29, 2023, Ms. Wade had no mobility impairments.

136.    From approximately 1:03 pm until at least 1:15 pm, Ms. Wade was in the shower.

137.    After she completed her shower, Ms. Wade returned to her cell.

138.    When she returned to her cell, Ms. Wade laid down on her boat.

139.    For the next several hours, Ms. Wade barely moved.

140.    Ms. Tibbetts did not accept the official story that there was nothing significantly wrong with Ms. Wade.  She contacted the deputy station on the emergency intercom that Ms. Wade was in really bad shape, that she was having a stroke or something really bad, and she needed medical attention.

141.    Deputy Toback was on duty, but he did not respond to Ms. Tibbett's call for help.

142.    During this post-lunch time period, Ms. Wade was disoriented, could not stand on her own, and her lips were blue and purple.

143.    Ms. Tibbetts had to help Ms. Wade get up to use the toilet.

144.     Ms. Wade laid down most of the time, her body was limp, and she was unable to do anything on her own.

145.     Based on her symptoms, Ms. Tibbets strongly believed Ms. Wade was having a stroke.  Like Ms. Jones, Ms. Tibbets had personal experience with a person having a stroke and she recognized the severity of Ms. Wade's symptoms.

146.     Because Ms. Tibbets appreciated the danger to Ms. Wade, she persistently tried to get medical attention for Ms. Wade.

147.     However, it was hours until Deputy Toback re-entered the cell block.

148.     Despite being told to monitor Ms. Wade, Deputy Toback did not monitor Ms. Wade for several hours as her conditioned worsened and her prognosis grew worse.

149.     At dinnertime, around 4:30 pm or 5:00 pm, Ms. Tibbets informed Deputy Toback that Ms. Wade could not come out for dinner.

150.     Deputy Toback brought a tray up to Ms. Wade's cell.

151.     Only at this point, approximately four hours four hours after Ms. Wade had vomited at lunch, did Deputy Toback take action to help.

152.     A female deputy brought a wheelchair and transported Ms. Wade to medical.

153.     When Ms. Wade was wheeled out of the cell block, some of the inmates applauded sarcastically to jeer the long delay in medical care.

154.     A reading of Ms. Wade's vital signs at 5:14 pm shows similar vital signs as during her midday visit. Her blood pressure remained hypotensive at 104/58 and her sitting pulse rate had dropped to 44.

155.    The notes in the medical record state: "[Weight] not taken as patient unable to stand without assistance. Pulse taken multiple times, between 42-46, BP remains hypotensive, 102/58."

156.    Even though Ms. Wade had been incarcerated for weeks and did not have access to any narcotics, Nurse ~~Stallard~~Barron provided Ms. Wade with a dose of Narcan, which is used to treat narcotic overdoses in emergency situations.

157.    Because she was not overdosing, Ms. Wade did not respond to Narcan.

158.    For approximately two hours, Ms. Wade was left alone in a cell on the medical unit. She did not receive any medical care during this time other than the Narcan dose, despite her alarming vital signs and her observable symptoms.

159.    While Ms. Wade was on the medical unit, she experienced continued numbness, dizziness, inability to communicate, and inability to ambulate.

160.    After approximately two hours of being left alone in the medical cell, an ambulance was finally called.

161.    Sometime around 6:30 pm, around nine hours after Ms. Wade began exhibiting stroke symptoms, she was finally transported to the Emergency Department of the Castle Rock Adventist Hospital ("Hospital").

162.    The first notation in her medical records from the Hospital is time-stamped 6:56pm.

163.    At the Hospital, Ms. Wade received an MRI of her brain, among other tests and examinations.

164.    The MRI revealed that Ms. Wade had a "dissection of the left vertebral artery at the level of the dural ring."

165.     Ms. Wade was diagnosed by doctors at the Hospital with an acute stroke, also known as an acute cerebral vascular accident ("CVA").

166.     This type of stroke affects the brain stem.

167.     Brain stem strokes typically affect, *inter alia*, bodily sensations, temperature regulation, pain, and autonomic functions (e.g., ability of the body to regulation blood pressure).

168.     Because Ms. Wade had arrived at the Hospital approximately nine hours after she began having symptoms, she was not a candidate for the most effective treatments which have been proven to mitigate the effects of stroke but are time sensitive.

169.     Ms. Wade also endured the pain and suffering associated with her symptoms for approximately nine hours prior to being sent to the hospital, and Defendants' delay unnecessarily prolonged her pain and suffering.

170.     Upon discharge, Ms. Wade was prescribed three months of oral anticoagulation medication followed by repeat CTA (computed tomography angiography) head and neck exams as well as acute rehabilitation.

171.     Four months after the stroke, Ms. Wade continues to have substantial physical and neurological impairments.

172.     She continues to have persistent headaches, numbness on her left side, left leg weakness and lack of coordination, difficulty ambulating, fatigue, and left-side eyelid droop.

173.     Based on the fact that Ms. Wade still presents with these symptoms months after stroke, it is to a reasonable degree of medical certainty that such symptoms are permanent and life-long.

174.   Ms. Wade may see mild improvement through physical therapy and other treatments, but she is highly unlikely to ever regain full function.

175.   Ms. Wade has significant physical, economic, and emotional damages as a result of her suffering and not being timely treated for her stroke.

## VI.   CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF**
**Violation of 42 U.S.C. § 1983 – Fourteenth Amendment**
**Deliberate Indifference to Medical Needs**
(Against Defendant Nurse ~~Stallard~~Barron)

176.   Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

177.   Plaintiff is a citizen of the United States and all Defendants to this claim are persons for purposes of 42 U.S.C. § 1983.

178.   Plaintiff had a clearly established right under the Fourteenth Amendment to be free from deliberate indifference to her known serious medical needs.

179.   Defendant ~~Stallard~~Barron, at all times relevant hereto, were acting under the color of state law.

180.   Defendant ~~Stallard~~Barron knew of Ms. Wade's onset of stroke symptoms and deteriorating condition and nonetheless, with deliberate indifference, decided not to refer her to other medical staff, chart her symptoms, conduct reasonable examinations or diagnostic tests, or provide her with or secure for her obviously necessary emergency-level medical care.

181.   Nurse ~~Stallard~~Barron failed to provide Plaintiff with reasonable medical care despite being expressly aware of Plaintiff's known medical needs.

182.    Nurse ~~Stallard's~~Barron's treatment (or lack thereof) was in reckless disregard to a substantial risk of physical harm to Plaintiff.

183.    Defendant ~~Stallard~~Barron continued to act in bad faith and with deliberate indifference to Plaintiff's serious medical needs and constitutional rights when she willfully ignored her and other inmates' repeated requests to provide her medical attention and intentionally denied and/or delayed her access to medical care.

184.    Defendant ~~Stallard~~Barron is not entitled to qualified immunity.

185.    Defendant ~~Stallard~~Barron is liable to the Plaintiff for violation of 42 U.S.C. § 1983.

186.    The acts or omissions of Defendant ~~Stallard~~Barron as described herein intentionally deprived Plaintiff of her constitutional rights and were moving forces and substantial significant contributing proximate causes of Plaintiff's injuries.

187.    As a direct result of Defendant ~~Stallard's~~Barron's unlawful conduct, Plaintiff has suffered injuries, damages and losses as described herein entitling her to compensatory and special damages including attorneys' fees in amounts to be determined at trial.

188.    As a further result of the Defendant ~~Stallard's~~Barron's unlawful conduct, Plaintiff has incurred significant special damages, including medically related expenses and will continue to incur further medically related expenses in amounts to be established at trial.

189.    Plaintiff has also suffered lost past and future earnings and impaired earnings capacities in ongoing amounts to be ascertained in trial.

190.    Plaintiff is further entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988, pre-judgment interest and costs as allowable by federal law,

191.    Plaintiff is entitled to punitive damages under 42 U.S.C. § 1983, in that the actions of Defendant ~~Stallard~~Barron were taken maliciously, willfully or with a reckless or wanton disregard of the constitutional rights of Plaintiff.

## SECOND CLAIM FOR RELIEF
### Violation of Colo. Const. Article II, Section 25 – C.R.S. § 13-21-131
### Deliberate Indifference to Medical Needs
(Against Defendant Toback)

192.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if set forth herein.

193.    Defendant Toback is, and was at all relevant times, a "peace officer" as defined by C.R.S. § 24-31-901(3) and therefore subject to C.R.S. § 13-21-131.

194.    Defendant Toback, at all times relevant hereto, was acting under the color of state law.

195.    At all relevant times, Plaintiff had a protected interest under Colo. Const. Art. II, Section 25 to due process of law, including to be free from deliberate indifference to her known serious medical needs.

196.    Defendant Toback knew of Ms. Wade's onset of stroke symptoms and deteriorating condition and nonetheless, with deliberate indifference, decided not to refer her to medical staff in a timely manner, nor provide her with or secure for her obviously necessary emergency medical care.

197.    Deputy Toback failed to provide Plaintiff with reasonable medical care despite being expressly aware of Plaintiff's known serious medical needs, which were obvious to a reasonable lay person.

198.     With deliberate indifference, Deputy Toback recklessly disregarded a substantial risk of physical harm to Plaintiff.

199.     Defendant Toback continued to act in bad faith and with deliberate indifference to Plaintiff's serious medical needs and constitutional rights when he willfully ignored her and other inmates' repeated requests to provide her medical attention and intentionally denied and/or delayed her access to medical care.

200.     Defendant Toback is not entitled to qualified immunity per C.R.S. § 13-21-131(1)(2)(b) .

201.     The acts or omissions of Defendant Toback as described herein intentionally deprived Plaintiff of her constitutional rights and were moving forces and substantial significant contributing proximate causes of Plaintiff's injuries.

202.     As a direct result of Defendant Toback's unlawful conduct, Plaintiff has suffered injuries, damages and losses as described herein entitling her to compensatory and special damages including attorneys' fees in amounts to be determined at trial.

203.     As a further result of Defendant Toback's unlawful conduct, Plaintiff has incurred significant special damages, including medically related expenses and will continue to incur further medically related expenses in amounts to be established at trial.

204.     Plaintiff has also suffered lost past and future earnings and impaired earnings capacities in ongoing amounts to be ascertained in trial.

### THIRD CLAIM FOR RELIEF
### Violation of 42 U.S.C. § 1983 – Fourteenth Amendment
### Deliberate Indifference to Medical Needs
(Against Douglas County Defendants and Defendant Wellpath)

205.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

206.    Defendant Wellpath and Douglas County Defendants are persons within the meaning of 42 U.S.C. § 1983.

207.    Defendant Wellpath, at all times relevant to this claim, was acting under the color of state law, as the functional equivalent of a municipality providing medical care to inmates.

208.    Douglas County Defendants, at all times relevant to this claim, were acting under the color of state law and had a non-delegable duty to provide constitutionally adequate medical care to inmates.

209.    Wellpath and Douglas County Defendants' deliberately indifferent policies, customs, and practices as described herein were moving forces and proximate causes of the violation of Ms. Wade's constitutional rights.

210.    Wellpath and Douglas County Defendants had a policy, custom, or practice of sending inmates to the Hospital only as a matter of last resort.  In furtherance of this policy, custom, or practice, Wellpath and Douglas County Defendants and its employees do not treat medical crises like emergency situations.

211.    Wellpath and Douglas County Defendants failed to properly train and supervise their employees to provide necessary medical care to detainees at the DCJC.

212.   Wellpath and Douglas County Defendants knew or should have known that their failure to train and supervise their employees would cause such employees to fail to provide necessary medical assessment and care, in violation of detainee's constitutional rights.

213.   Wellpath and Douglas County Defendants' failure to train and supervise their employees was a moving force and proximate cause of the violation of Ms. Wade's constitutional rights.

214.   Defendants were willful participants in a joint activity.

215.   The policies, customs, and practices of Wellpath and Douglas County Defendants as described herein deprived Ms. Wade of her rights, privileges, liberties, and immunities secured by the United States Constitution, and caused Plaintiffs other damages.

216.   As a direct result of Defendants' unlawful conduct, Plaintiff has suffered injuries, damages and losses as described herein entitling her to compensatory and special damages including attorneys' fees in amounts to be determined at trial.

217.   As a further result of the Defendants' unlawful conduct, Plaintiff has incurred special damages, including significant medically related expenses and will continue to incur further medically related expenses in amounts to be established at trial.

218.   Plaintiff also suffered lost past and future earnings and impaired earnings capacities in ongoing amounts to be ascertained in trial.

219.   Plaintiff is further entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988, pre-judgment interest and costs as allowable by federal law.

**FOURTH CLAIM FOR RELIEF**
**Medical Negligence**
(Against Defendant Wellpath and Nurse ~~Stallard~~Barron)

220.     Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

221.     Defendant Wellpath is a private corporation that contracts to provide medical care and health services to inmates at DCJC.

222.     Defendant Nurse ~~Stallard~~Barron is also a private individual, not a public official.

223.     Defendants to this claim are properly sued for state law negligence as they are a private corporate and a private individual and therefore are not entitled to any immunity under the CGIA.

224.     At all times relevant hereto, Plaintiff was under the care and treatment of Defendant Wellpath's staff, including Nurse ~~Stallard~~Barron, through Wellpath's contractual relationship with the Douglas County Sheriff's Office.

225.     Defendant Wellpath is vicariously liable for the negligent acts and omissions by its agents and/or employees including Nurse ~~Stallard~~Barron, and it is directly liable for its own negligent failures in training, policies, and practices.

226.     Defendants had a duty to provide reasonable medical care and treatment to inmates at DCJC, including Plaintiff, and Defendant Wellpath had a duty to exercise reasonable care in the training and supervision of its employees.

227.     These duties of care are informed by state law. Under C.R.S. § 16-3-401, "prisoners arrested or in custody shall be treated humanely and provided with adequate food, shelter, and, if required, medical treatment." The provision of adequate medical treatment and humane care is a

statutory obligation under this and other statutes. These duties are also informed by National Commission on Correctional Health Care ("NCCHC") standards.

228. Nurse ~~Stallard~~Barron, while acting within the scope of her employment, breached her duty of care to Plaintiff and was negligent when she failed to adequately assess, monitor, treat, and care for Plaintiff.

229. Nurse ~~Stallard~~Barron had a nurse-patient relationship with Plaintiff and was acting or failing to act within the scope of her employment at all relevant times.

230. Nurse ~~Stallard~~Barron owed Plaintiff a duty to exercise that degree of care, skill, caution, diligence and foresight exercised by and expected of medical personnel in similar situations.

231. Nurse ~~Stallard~~Barron grossly deviated from that standard of care and was negligent in failing to properly care for and treat Plaintiff's known serious medical needs in the health care services she failed to provide. Among other things, she further breached that duty of care in negligently failing to properly assess Plaintiff, negligently charting her symptoms and complaints, negligently failing to call for a higher-level evaluation and negligently failing to urgently transport her during a clear medical emergency.

232. Defendant Wellpath had a duty to exercise reasonable care in the training and supervision of its employees and agents in a manner that provided the detainees under their care with reasonable medical care and treatment.

233. Defendant Wellpath breached its duty to exercise reasonable care in the training and supervision of their subordinate employees and agents.

234.    Defendant Wellpath knew or should have known of the lack of supervision, experience, and training among its employees and agents, also had reason to know that their employees and agents were likely to harm DCJC detainees in need of medical care, including Ms. Wade.

235.    In failing to exercise reasonable care in the training and supervision of its employees and agents relative to their providing reasonable medical care and treatment, Wellpath was negligent.

236.    The negligence of Defendants Wellpath and ~~Stallard~~Barron was attended by circumstances of malice, or willful and wanton conduct, which Defendants must have realized was dangerous, or that was done recklessly, without regard to the consequences to Plaintiff.

237.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff suffered significant physical and mental pain and suffering, and other damages.

238.    Plaintiff is entitled to general and compensatory damages for such pain and suffering and emotional distress and to special damages for past and future medical and health care related expenses, all in amounts to be proven at trial.

239.    Plaintiff has also suffered lost past and future earnings and impaired earnings capacities in ongoing amounts to be ascertained in trial.

## PRAYER FOR RELIEF

Plaintiff prays that this Court enter judgment for the Plaintiff and against each of the Defendants and award the following relief:

1.  All appropriate relief at law and equity;

2.  Economic losses on all claims as allowed by law;

3.   Compensatory and consequential damages, including damages for emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

4.   Punitive damages on all claims allowed by law and in amount to be determined at trial;

5.   Attorney fees and costs associated with this action, including expert witness fees, on all claims allowed by law;

6.   Pre-and post-judgment interest at the appropriate lawful rate;

7.   Declaratory and other appropriate equitable relief; and

8.   Any further relief that this Court deems just and proper, and any other relief as allowed by law and equity.

**PLAINTIFF RESPECTFULLY REQUESTS A JURY TRIAL ON ALL TRIABLE ISSUES.**

Respectfully submitted this ~~29th~~30th day of ~~September, 2023~~January, 2024.

RATHOD | MOHAMEDBHAI LLC

*s/ Matthew Cron*
Matthew Cron
Ciara M. Anderson
RATHOD | MOHAMEDBHAI LLC
2701 Lawrence St., Ste. 100
Denver, CO 80205
(303) 578-4400 (t)
(303) 578-4401 (f)
mc@rmlawyers.com
ca@rmlawyers.com

ATTORNEYS FOR PLAINTIFF